# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATHLEEN CARR<br><br>*Plaintiff,*<br><br>v.<br><br>STATE OF NEW JERSEY DEPARTMENT OF HUMAN SERVICES, et al.,<br><br>*Defendants.* | Civil Action No.: 13-cv-5478 (PGS)(LHG)<br><br>MEMORANDUM AND ORDER |

SHERIDAN, U.S.D.J.

This matter is before the Court on a motion for summary judgment brought by Defendant the State of New Jersey Department of Human Services, Trenton Psychiatric Hospital, Ancora Psychiatric Hospital, Teresa McQuaide, and Christopher Morrison (hereinafter collectively as "Defendants"). (ECF No. 27).

I.

Generally, Defendants argue that the case should be dismissed because there was an ongoing state court process wherein an Administrative Law Judge (ALJ) and the Superior Court of New Jersey, Appellate Division decided the matter. Accordingly, Defendants argue that the case is barred by res judicata, collateral estoppel and the entire controversy doctrine.

More specifically, this matter was initially filed in the New Jersey Superior Court on August 5, 2013, then removed to this Court on a cause of action that asserted a violation of the Family and Medical Leave Act of 1993, 29 U.S.C. 2601 et seq. At the time that the Complaint

was filed in this Court, the ALJ had not yet rendered a decision. The ALJ's decision was thereafter rendered on August 16, 2013. On October 9, 2014, this Court granted a stay on this matter due to a pending appeal before the Superior Court of New Jersey, Appellate Division. (ECF No. 19). After the Appellate Division's decision, the stay was vacated, and on October 19, 2017, Defendant filed a motion for summary judgment. (ECF No. 27), including a statement of uncontested material facts in support of their motion. ("Def. SOMF", ECF No. 27-2). Thereafter, Plaintiff submitted its response as well as a counterstatement of disputed material facts. (ECF No. 35-1).

## II.

Presented below are the facts from Defendant's Statement of Uncontested Material Facts, and within same, Plaintiff's responses are set forth in footnotes.

1) Plaintiff Kathleen Carr ("Plaintiff") is a former Personnel Assistant for Defendant Trenton Psychiatric Hospital ("TPH"). She transferred to TPH from the Ancora Psychiatric Hospital ("APH") in approximately November 2010.

2) This matter arises from the suspension and ultimate removal of Plaintiff from her employment with TPH. Plaintiff argues that she "was discriminated against and subject to a hostile work environment due to gender, age and her own disability."

3) On May 24, 2011, TPH issued a Preliminary Notice of Disciplinary Action (PNDA) to Plaintiff, suspending her for twenty (20) days, for misconduct, including:

    a.    failing to learn payroll procedures from her supervisor;

    b.    being uncooperative, argumentative, accusatory and inappropriate with a Human resources supervisor;

    c.    approving correspondence that contained incomplete and incorrect information;

    d.    failing to delete a former employee's access to the Time Keeping System after they were no longer employed by TPH;

    e.    attempting to return two employees to work who had been on extended leaves of absence without following proper TPH procedures;

f.  scheduling her own fingerprinting;

g.  completing and reviewing her own Federal Family Medical Leave Act (FMLA) leave;

h.  refusing to complete the New Hire Package for new TPH employees;

i.  disclosing confidential protected health information of employees who were out on leave;

j.  failing to disclose two periods of employment with the State of New Jersey in her employment application; and

k.  refusing to cooperate with interviewers from the Office of Employee Relations. (See Certification of Counsel, Ex. D).

4) On November 9, 2011, TPH prepared a Final Notice of Disciplinary Action (FNDA) which imposed a suspension for twenty (20) working days commencing on a date which was to be determined later along with a demotion to the position of Personnel Assistant 2. (See Certification of Counsel, Ex. E)[1].

5) Plaintiff appealed that determination and the matter was transmitted to the New Jersey Office of Administrative Law ("OAL") by the Civil Service Commission ("CSC").

6) On February 23, 2012, TPH filed an Amended FNDA regarding Plaintiffs suspension. (See Certification of Counsel, Ex. F).

7) On June 17, 2011, TPH issued another FNDA to Plaintiff, this time removing her from employment, and suspending her effective June 17, 2011 for misconduct, including:

a.  refusing to update management and contact the Office of Employee Relations regarding a payroll staff member's performance;

b.  referring to employees in an unprofessional and insubordinate manner, including calling an individual a "little squirt" and an "a**hole"; and

c.  discussing the confidential disciplinary history of a member of the Payroll Office with another employee of TPH. (See, Certification of Counsel, Ex. H)[2].

---

[1]  Plaintiff responded that she "contested the FNDA, and after a departmental hearing, Plaintiff was suspended and demoted" (Plaintiff's response, ¶ 4).
[2]  Plaintiff disputes this fact and argues that "Plaintiff contested the PDNA (preliminary notice of disciplinary action) and after a departmental hearing, Plaintiff was issued a Final Notice of Disciplinary Action removing her from employment." (Plaintiff response, ¶ 8).

3

8) TPH prepared a FNDA on February 24, 2014, removing Plaintiff from employment effective August 5, 2011. (See Certification of Counsel, Ex. I).

9) Plaintiff appealed that determination and the matter was transferred to the OAL by the CSC.

10) Plaintiff's suspension and removal from employment were both heard by Administrative Law Judge John R. Futey on September 25, September 27, November 21 and December 3, 2012, and February 12 and February 14, 2013.[3]

11) The OAL specifically considered Plaintiff's Law Against Discrimination ("LAD") and Conscientious Employee Protection Act ("CEPA") claims and held that the "absence of any viable proofs by [Plaintiff] in…regard [to her LAD and CEPA claims] negates any such claims under the circumstances and, in any event, [Plaintiff] totally failed to carry her burden regarding those claims." (See Certification of Counsel, Ex. B, p. 34-35)[4].

12) Judge Futey held that Plaintiff advanced her claims through the statutory framework of CEPA at her OAL proceeding. (See id., p. 30)[5].

13) Judge Futey determined that Plaintiff "totally failed to carry her burden" under CEPA. (See id., p. 34-35).

14) Judge Futey did not find "any actual animus or effort to retaliate against [Plaintiff] by TPH in any of its charges against her attendant to this matter." (See id.)[6].

15) Judge Futey determined that TPH had shown legitimate, non-discriminatory reasons to demand her compliance with its orders and directives. (See id., p. 38)[7].

16) Judge Futey found that "Plaintiff's request for leave under the Family Medical Leave Act ("FMLA") was eventually approved, the initial issue was that it was unethical for Plaintiff to approve leave for herself in the first place. (See id., p. 9)[8].

---

[3] Plaintiff admits this, except to state that Plaintiff challenged her discipline and the matters were joined, but not consolidated.

[4] Plaintiff disputes this contention; and argues that Plaintiff was "discriminated against, harassed, and subject to a hostile work environment due to gender, age, and her own disability . . ." (Plaintiff's Response ¶ 12).

[5] Plaintiff disagrees ((Plaintiff's Response ¶ 15).

[6] Plaintiff admits same, except with regard to the cat's paw theory. (Plaintiff's Response ¶ 15).

[7] Plaintiff admits same except for the impropriety of the timing of both levels of discipline, and the cat's paw theory. (Plaintiff's Response ¶ 16).

[8] Plaintiff disputes same because "Lorraine Miller testified that although she eventually did approve the leave for Carr, the problem was that it was unethical for Carr to have done so in the first place by approving leave for herself. (Plaintiff's Response ¶ 16).

4

17) Judge Futey determined that Plaintiff "was the one who was in the position to routinely respond to appropriate directives [of her supervisors], yet, for whatever reason efforts of TPH to maintain and manage a viable institutional system." (See id.).

18) Eleven (11) days before OAL reached its decision regarding Plaintiff's suspension and ultimate removal from employment (August 5, 2013) Plaintiff filed the instant Complaint. (See Certification of Counsel, Ex. A).

19) Specifically, Plaintiff alleges in her Complaint that:

   a. Plaintiff was subject to harassment, discrimination and retaliation on the basis of her age in violation of the LAD when she was issued her suspension and discharge. (Id., ¶¶ 17-130).

   b. Plaintiff was subject to retaliation in violation of the CEPA when she was issued her suspension and discharge. (Id., ¶¶ 17-128, 131-132).

   c. Plaintiff was subject to discrimination and retaliation in violation of the FMLA when she was issued her suspension and discharge. (Id., ¶¶ 17-128, 133-134).

20) Plaintiff subsequently appealed the decision of Judge Futey to the Superior Court of New Jersey, Appellate Division. (See Certification of Counsel, Ex. C).

21) In a decision dated August 7, 2017, the Appellate Division affirmed the CSC's final agency decisions. (See id.).

22) All of the allegations in the Complaint occurred prior to the CSC issuing its final administrative decisions.

23) All of the allegations in the Complaint occurred prior to the OAL's decision.

24) All of the allegations in the Complaint occurred prior to the Appellate Division's affirmation of the CSC's final agency decisions.

### III.

Plaintiff's counterstatement of facts are presented below.

1. Plaintiff, Kathleen Carr, ("Plaintiff") was a Civil Service employee who was employed by the New Jersey Department of Human Services, first at Defendant Ancora Psychiatric Hospital ("Ancora") and then at Defendant Trenton Psychiatric Hospital ("TPH").

2. Plaintiff was disciplined and ultimately discharged as a result of an investigation/disciplinary charges by Defendant Adam Stevens.

5

3.  Plaintiff administratively challenged her discipline and discharge under the Civil Service Act at the Office of Administrative Law (the "OAL") and the matters were joined for trial but not consolidated. (Burns Cert., Exhibit B at p. 2-3).

4.  On August 5, 2013, Plaintiff filed the instant Complaint alleging inter alia retaliation by TPH in response to her failure to participate/objections that Defendants were discriminating against African American females and illegally denying federal Family and Medical Leave Act (the FMLA) leave to employees. (Burns Cert., Exhibit A).

5.  Plaintiff also asserts, however, that Defendants illegally discriminated against, harassed her and subjected her to a hostile work environment, due to her gender, age and her own disability in violation of the LAD. (Burns Cert., Exhibit A at 17, 18, 41, 72, 122, 123, 124, 125 and 130).

6.  Plaintiffs action in the case at bar relates both to her employment at Ancora and at TPH. (Burns Cert., Exhibit A).

7.  Plaintiff also asserts discrimination claims separate and apart from her wrongful termination claims. (*Id.*).

8.  In particular, Plaintiff claims that she was subjected to a hostile work environment and discriminated against at both Ancora and TPH. (*Id.*).

9.  These claims were not part of the administrative appeal. (Burns Cert., Exhibit B; Bratti Cert., Exhibit F).

10. In the case at bar, Plaintiff claims that her accuser, Defendant Adam Stevens, was discriminatorily biased against her and instigated and influenced others to discipline and ultimately discharge Plaintiff for engaging in protected activity. (Bratti Cert., ¶2).

11. Plaintiff also asserts that Defendant Stevens' conduct was a pretext for discrimination/retaliation. (Bratti Cert., ¶3).

12. Cross-examination at the administrative hearing revealed evidence of this bias/discrimination on the part of Defendant Adam Stevens, which even the ALJ found in his opinion to raise concern regarding potential ethical conflicts of which he [Mr. Stevens] may have been a part. (Burns Cert., Exhibit B at p. 31).

13. The ALJ issued his Initial Decisions on August 16, 2013 affirming Plaintiff's suspension/demotion and her removal. (Burns Cert., Exhibit B; Bratti Cert., Exhibit F).

14. In so holding, the ALJ specifically declined to make any findings regarding the pretextual conduct of Plaintiffs accuser, Defendant Adam Stevens, who investigated and pressed charges against Plaintiff. (Burns Cert., Exhibit B at p. 31 and Bratti Cert., Exhibit F at p. 20).

15. The ALJ ruled that it would be for "another tribunal to directly assess any such adverse impact [by Mr. Stevens in the decision to terminate Plaintiff]", and did not rule as to the Cat's Paw theory of liability. (*Id.*).

16. The ALJ then found that "absent such findings [of another tribunal] to either diminish or discount his role," neither Mr. Stevens' potentially improper role in the discipline nor his investigation or analysis of Plaintiff would be addressed by the ALJ. (*Id.*).

17. The ALJ relied upon the testimony of the decision-makers themselves which he allegedly found -credible even without the testimony of Stevens." (*Id.*).

18. It was Stevens who conducted the investigation and drafted the disciplinary action notices against Plaintiff. (Bratti Cert. Exhibit I).

19. Mr. Stevens admitted that he started his investigation of Plaintiff immediately after she complained that TPH employee (Ms. Astorino) was improperly targeting black females for discipline. (Bratti Cert., Exhibit G).

20. Indeed, Ms. Astorino admitted that Plaintiff accused her of targeting black females. (T157:16 to 158:21).

21. Within a short time thereafter, Stevens created a draft Preliminary Notice of Disciplinary Action disciplining Plaintiff for being insubordinate to Ms. Astorino. (Bratti Cert., Exhibit H). In so doing, Stevens never asked Plaintiff for her side of the story. (T. 191:20 to 193:17).

22. Stevens did not take into consideration that alleged insubordination as to Astorino was the result of Plaintiff's complaining about (and refusal to participate in) Astorino's improper targeting of black females. (T186:1 to 10).

23. He considered any such inquiry beyond the scope of his investigation/authority. (*Id.*).

24. In including discipline in the PNDA related to family leave issues, Mr. Stevens did not consider issues related to Plaintiff's Complaint of improper conduct with respect to FMLA leave. (5T 235:10 to 16).

25. Mr. Stevens actively withheld from the decision-makers information which would have militated against disciplining Plaintiff for these infractions and/or which would have revealed his discriminatory bias. (Burns Cert., Exhibit D; 2T 157:22 to 160:23; 21179:18 to 180:8; 5123:4 to 22).

26. The PNDA did not contain any information regarding Plaintiff's complaint that Ms. Astorino was targeting black females. (Burns Cert., Exhibit D).

7

27. With respect to allegedly improper FMLA emails, Mr. Stevens failed to disclose that he was aware of Plaintiff's emails since February 2011 or to explain why discipline was not proposed earlier. (2T 157:22 to 160:23).

28. When asked why by the ALJ if he had an ethical duty to report the issue sooner if he truly believed there was an issue, Mr. Stevens responded that he had not done so because he "was afraid of retaliation." (2T 157:22 to 160:23).

29. There are indications that Stevens believed that he was acting to impress his superiors by helping to limit / reduce the amount of family leave being taken by employees. (7T 24:23 to 26:1).

30. As to the discipline of Plaintiff for allegedly improperly sending letters to benefits recipients, Stevens failed to disclose to the decision-makers that it was in fact he that had sent the letters. (2T 179:18 to 180:8).

31. Mr. Stevens instead drafted the disciplinary notice to state that Plaintiff ". . . took it upon [herself] to direct staff to draft letters for [her] signature." (Burns Cert., Exhibit D at Carr OAL 51).

32. He never advised the decision-makers that it was he who drafted the letters or that he in believed the conduct to be proper at the time. (2T 179:18 to 180:8).

33. Stevens also withheld from the decision-makers the fact that Plaintiffs supervisor had authorized certain conduct for which she was being disciplined even though he knew that to be the case. (5T 23:4 to 22).

34. If Stevens had disclosed these facts, Plaintiff may not have been terminated. (5T 96:21 to 98:8).

35. Mr. Stevens denies any influence in the decision-making process. Instead, he claims that it was Plaintiffs supervisor, Ms. Maher who was responsible for Plaintiffs discipline. (5T 152:12 to 153:13).

36. Ms. Maher did not request that Plaintiff be terminated. (1T190:4 to 191:17) and, in fact, did not believe that Plaintiff was "incompetent" as alleged in the PNDA drafted by Mr. Stevens. (1T 134: 1 to 136: 13).

37. Mr. Morrison (the person Maher believed to be responsible for the discipline of Plaintiff) did not believe Plaintiff should have been disciplined as to certain conduct included in the PNDA. (5T 69:20 to 71:5; 5T 71:23 to 72:15).

38. Mr. Stevens' charges included these charges as well as a charge of incompetence which were accepted by the ultimate decision-makers without review of the alleged underlying facts. (1T 134:1 to 136:13; 5T 9:22 to 10:3).

39. The ultimate decision-makers relied unquestionably upon Mr. Stevens" analysis. (5T 9:22 to 10:3).

40. The ultimate decision-maker, CEO, Ms. Teresa McQuade, did not make any effort to independently evaluate the substance or sufficiency of the charges or the underlying facts/specifications upon which they were based. (5T 9-22 to 10-3).

41. Instead, she relied upon those who had -investigated" the matter, that is, Mr. Stevens. (5T 9:22 to 10:3)

42. Although Teresa McQuade was responsible for issuing the discipline as to Plaintiff, she claimed that it was actually Mr. Stevens who was responsible for Plaintiff's discipline. (Id.; 5T 41:5 to 19).

43. According to Ms. McQuade, she did not know anything about Plaintiff's conduct or even what Mr. Stevens was authorized to investigate. (5T 15:13 to 17:22).

44. Ms. McQuade simply reviewed the discipline presented by Mr. Stevens and assumed it was accurate. (5T 17:23 to 18:9).

45. Mr. Morrison also was not involved in drafting the preliminary notice of disciplinary action or in disciplining Plaintiff. (3T 171:6 to 172:14).

46. According to Mr. Morrison, the Employment Relations Office (that is, Mr. Stevens) was "in charge of discipline." (3T 172:20 to 174:9).

47. TPH decision-makers did not make any effort to independently evaluate the substance or sufficiency of the charges presented by Stevens or his analysis. (5T 9:22 to 10:3; 3T 171:6 to 172:18).

48. The ALJ left questions regarding the influence and motivations of Mr. Stevens in the discipline of Plaintiff to "another tribunal." (Burns Cert., Exhibit B at p. 31).

In the course of the state proceedings, the disciplinary charges were, as noted above, forwarded to the Office of Administrative Law (OAL) for a trial. Administrative Law Judge Futey ("ALJ") issued a lengthy opinion on August 16, 2013, finding against Ms. Carr. During the proceedings, Judge Futey heard testimony from several witnesses, and reviewed numerous charges of misconduct, insubordination, neglect of duty and incompetency against Carr. (Op. pg. 26). In addition, Judge Futey found the charges credible. (Id.) He opined,

9

> After having considered the testimony adduced from the witnesses who appears I FIND that, although appellant [Carr] attempted to discredit the testimony of all of those TPH witnesses through cross-examination, the absence of any direct testimony by either appellant (who, it is noted, did not testify) or any witnesses on her behalf as it applied to the plethora of charges and specifications which were generated in the suspension/demotion discipline caused the bulk of the testimony of the TPH witnesses to remain intact, viable and credible at the conclusion of the matter.

(Op. pg. 31). Further, Judge Futey found the defendant's witnesses to be forthright. He stated:

> Each of those witnesses presented cogent, relevant testimony regarding the respective roles they played in this matter. This even applied to the investigation by Adam Stevens, despite some concerns raised by this tribunal during the hearing about potential ethical conflicts of which he may have been part of.

(Op. pg. 33). Judge Futey found that,

> The relevant testimony presented further demonstrates that Carr violated numerous policies and procedures regarding her handling of her own personal matters. In particular, I FIND that the proofs demonstrate that she was not authorized to schedule her own fingerprinting at TPH since she was still an Ancora employee pending a transfer to TPH.

(Op. pg. 33). Similarly, Judge Futey found Plaintiff's actions regarding the completion of her FMLA application to have been "blatant, flagrant, overt, and clear example of falsification. It also speaks ill to her role as a supervisor, since accuracy and completeness should be the two hallmarks of people who are charged with a responsibility to lead others at the agency." (Op. pg. 34). Judge Futey concluded that "Carr's actions were wrong when she disclosed the reasons for her medical leave requests and that she should be held accountable for her malfeasance." (Op. pg. 35). In addition, ALJ Futey addressed Carr's claims of retaliation under CEPA, NJLAD, and the FMLA. He did not find "any actual animus or effort to retaliate against her by TPH in any of its charges against her attendant to this matter." Given the circumstances and after having considered all the evidence, ALJ Futey

> "was not satisfied that Carr [had] sufficiently demonstrated that her protected activities were substantial or motivating factor in the

> alleged retaliatory actions taken by TPH against her. Rather TPH has shown legitimate, non-discriminatory reasons to demand her compliance with its various orders and directive..." (Op. pg. 38).

The decision was adopted by the Civil Service Commission ("Commission").

Plaintiff appealed the Commission's adoption of ALJ's Futey's decision to the New Jersey Superior Court of New Jersey, Appellate Division. On August 7, 2017 the Appellate division affirmed the Commission's final agency decisions, substantially for the same reasons expressed by ALJ Futey and by the Commissioner. (*See Burns Cert*. Ex. C ECF No. 27-8).

## IV.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier*

*Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor "that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

V.

Defendant now brings a motion for summary judgment arguing that Plaintiff's claims should be dismissed because they are barred by the Commission's decision and the Appellate Division's affirmance under the doctrines of collateral estoppel, res judicata, and the entire controversy doctrine. Moreover, Defendant argues two points. First, the issues were adjudicated, and there is no reason to relitigate them. Secondly, even if the issues were not adjudicated, Plaintiff is barred because she had the opportunity to raise them before ALJ Futey, but she failed to do so. Plaintiff counters that her claims under CEPA, NJLAD, and the FMLA could not have been raised before the Commission because the Commission lacked jurisdiction to hear them. The Plaintiff's argument lacks merit. The Court will initially address the CEPA, NJLAD and FMLA causes of action, and then discuss the racial discrimination claim.

Generally, "a federal court may give collateral estoppel effect to a state administrative agency determination if two requirements are met." Initially, it must find the administrative agency acted in a judicial capacity and resolved disputed issues of fact; and second, the full faith and credit

clause requires that the state decision be given preclusive effect. 28 U.S. § 1738. *See, O'Hara v. Board of Education*, 590 F. Supp. 696, 701 (D.N.J.1984), aff'd *O'Hara v. Board of Educ.*, 760 F.2d 259 (3d Cir. 1985) (internal citations omitted); *See also, Peterson v. Holmes*, 2017 U.S. Dist. LEXIS 66327, *17 (D.N.J. May 2, 2017). Upon the Court's review, the hearing and the opinion of Judge Futey were conducted and decided fairly, and in a very professional manner. The issue here is whether the doctrine of preclusion bars this action.

Defendant initially argues that collateral estoppel precludes this action. Under New Jersey law, a party invoking the doctrine of collateral estoppel must demonstrate that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding. *Wildoner v. Borough of Ramsey*, 316 N.J. Super. 487, 506, 720 A.2d 645 (App. Div. 1998) (*citing In re Dawson*, 136 N.J. 1, 20, 641 A.2d 1026 (1994)). Here, Plaintiff argues that the ALJ did not review her claims under CEPA, NJLAD and FLMA. This assertion is incorrect. ALJ Futey considered retaliation claims under CEPA, NJLAD, and FLMA and noted that he found no animus or effort to retaliate against her. See, ALJ Futey's decision discussed on pages 9-10 above. Moreover, when comparing the complaint to the administrative hearing, all of the issues were presented (factor 1) and litigated (factor 2) by the same parties (factor 5). The ALJ recommended, the CSC approved, and Appellate Division affirmed, so the decision was final (factor 3) and were essential to the final judgment (factor 4). As such, the doctrine of collateral estoppel bars this case.

In this case, Plaintiff did not testify at the administrative hearing before ALJ Futey; and now she seeks to present such testimony. In an analogous case, the Supreme Court of New Jersey held that an employee could not withhold defenses before an administrative agency in order to bring them in subsequent litigation. The Supreme Court held:

> A litigant should not be permitted to participate in the administrative system designed to promote a fair and uniform statewide system of public employee discipline, raise a... defense, and then hold back on the defense in an attempt to save it for later duplicative litigation. No efficient and respected system of justice can permit the spectacle, and resulting disrepute, of inconsistent litigated matters involving the same transactional set of facts, notwithstanding that the forums embrace judicial and quasi-judicial proceedings. The public will neither understand nor appreciate the confounding wastefulness of such a result[.]

*See, Winters v. North Hudson Regional Fire and Rescue*, 212 N.J. 67, 72-73 (2012). Rather, once the issues are presented before the administrative tribunals, "both the employer and employee must live with the outcome, including its potential preclusive effect on related employment-discrimination litigation." *Id.*, at 73. (*See also Morris v. City of Trenton*, 2 U.S. Dist. LEXIS 136003, *12 (D.N.J. Sept. 26, 2014). Moreover, "collateral estoppel applies to prevent a party in the subsequent litigation from engaging in factfinding in the hopes of proving previous factfinding incorrect." *See also Morris v. City of Trenton*, 2 U.S. Dist. LEXIS 136003, *13. Here, Plaintiff is swimming against the tide. She argues for more fact finding; but she did not testify at the hearing before ALJ Futey where she could have presented other evidence. Plaintiff is now looking for a second opportunity to litigate the same issues (see ALJ Futey's decision as noted on p. 10-11 supra.). As noted above, ALJ Futey's opinion addressed the CEPA, NJLAD and FMLA claims as well as the retaliation claim and he dismissed them based on the evidence. He stated:

> I reject the arguments of appellant that somehow any discipline sought against Carr was motivated by animus or somehow in violation of her rights under the Conscientious Employee Protection Act, the New Jersey Law Against Discrimination, and the Family and Medical Leave Act." (Op. pg. 34)

In conclusion, the doctrine of collateral estoppel precludes the Plaintiff from relitigating the same facts on CEPA, NJLAD and FMLA as are presented in this case when ALJ Futey had already done so.

Another one of Plaintiff's claims is based upon racial discrimination. Although the facts and analysis for determining a NJLAD claim and a racial discrimination claim under federal law similar, it is not clear whether ALJ Futey considered a racial discrimination claim. Within Plaintiff's counterstatement of facts, she alleges that Mr. Stevens was the source of the racial discrimination, and that he forced others to implement his racial bias. To raise such claims here may invoke the doctrine of res judicata and collateral estopped. Generally, a litigant may be barred from raising claims of racial discrimination that could have been brought before an ALJ by the doctrine of res adjudicata. The Third Circuit has stated:

> The doctrine of res judicata bars not only claims that were brought in a previous action, but also claims that could have been brought. It protects litigants from the burden of relitigating an identical issue with the same party or his privity and promotes judicial economy by preventing needless litigation. Both New Jersey and federal law apply res judicata or claim preclusion when three circumstances are present: (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action.

*In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008) (further citation and internal quotations omitted). Here there was a hearing before ALJ Futey with the same parties, presenting the same facts, as well as a final judgment on the merits. Although ALJ Futey's decision does not specifically reference racial discrimination, he discussed the testimony of Stevens noting the testimony as a whole presented "cogent" testimony to fire Plaintiff. As such, the three factors are met here. Since the collateral estoppel issue was discussed above, it suffices to say ALJ Futey discussed Stevens

testimony and made findings based on same. In short, Plaintiff should have raised them before ALJ Stevens. See, *Winters*, 212 N.J. at 72-7; Morris at 2 Lexis at 136003 *12.

In addition, "New Jersey's entire controversy doctrine, 'compels the parties, when possible, to bring all claims relevant to the underlying controversy in one legal action,' including defenses and counterclaims. It does so by barring parties from raising, in a subsequent proceeding, any claims it knew, or should have known about, during a prior proceeding. The doctrine does not bar claims that "accrued after the pendency of the original action." *Napoli v. HSBC Mortg. Servs.*, 2012 U.S. Dist. LEXIS 121204, *8-10, (D.N.J. 2012) (internal citations omitted).

As noted above, Plaintiff argues that the entire controversy doctrine does not apply to this case because this is not an appeal of the ALJ's decision and the ALJ did not have jurisdiction over the claims in the case. *Paskett v. Southern State Corr. Facility*, 2016 N.J. Super. Unpub. LEXIS 1675, *100 (N.J. Super. Ct. July 18. 2016). Similar to collateral estoppel, "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it in which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Morris at 2014 U.S. Dist. LEXIS 136003*, *14 (quoting *University of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986). Here, as previously mentioned, Judge Futey was acting in a judicial capacity, thus the Court finds that the entire controversy doctrine applies. The claims raised by Plaintiff are based on the same facts discussed in the administrative proceedings. If Plaintiff had other facts or other arguments against Stevens she could have raised same before the ALJ as defense. Since she failed to do so, she is now barred from bringing these claim before this Court under the entire controversy doctrine. More specifically, in *Morris* Judge Bongiovanni stated,

> The Third Circuit has definitively stated that a "federal court hearing a federal cause of action is bound by New Jersey's entire controversy doctrine, an aspect of the

substantive law of New Jersey, by virtue of the Full Faith and Credit Act." [*Rycoline Prods. v. C & W Unlimited*, 109 F.3d 883, 887 (3d Cir. 1997)]; *Peduto v. City of North Wildwood*, 878 F.2d 725, 728 (3d Cir. 1989). However, as explained above, the Full Faith and Credit Clause does not apply to unreviewed administrative decisions. In conjunction with the New Jersey Supreme Court's pronouncement that the doctrine is at least roughly analogous to res judicata, logically then, the doctrine's application in a case like this would have to be mandated by the same general federal common law rules that govern claim preclusion.

*Morris*, 2014 U.S. Dist. LEXIS 136003, at *20-21. Here, the Appellate Division affirmed the recommendation of Judge Futey and the adoption of the opinion by the CSC, as such, the entire controversy doctrine applies.

### Stevens Testimony

There is one last issue that must be addressed in this case. Plaintiff alleges that Stevens conducted an investigation, and he "was discriminatory biased against Plaintiff and/or retaliated against her for engaging in protected conduct." Accordingly, Plaintiff argues that "this civil action is based upon a cat's paw theory of liability . . . [and] the factual and legal issues related to cat's paw liability were specifically carved out of the administrative proceedings. Instead, ALJ Futey's decision noted his finding would be for "another tribunal to more directly assess any such adverse impact." Plaintiff argues that ALJ Futey excluded the cat's paw theory of liability by stating "another tribunal" as opposed to himself would be reviewing that cause of action. This argument appears to be taken out of context. During the hearing, ALJ Futey raised some concerns about ethical conflicts of Stevens. Despite the ethics conflict, ALJ Futey found the testimony to be "cogent and relevant". And all of the evidence "was credible even without the testimony of Stevens." ALJ Futey's reference to "another tribunal" was not referring to subsequent litigation as Plaintiff suggests, but an acknowledgement that the Appellate Division may review Stevens'

testimony differently. ALJ Futey's opinion does not carve out the cat's paw theory of liability. In fact, ALJ Futey considered all of the evidence.

ORDER

This matter, having been brought before the Court by Defendants' motion for Summary Judgment [ECF No. 27], and the Court having considered the briefs and submissions of the parties, and having heard oral argument;

IT IS on this 23 day of January, 2019;

**ORDERED** that Defendant's motion for summary judgment (ECF No. 27) is GRANTED. The Clerk is directed to close the file.

PETER G. SHERIDAN, U.S.D.J.